### PEOPLE v. SUYDAM.

(Supreme Court, Appellate Division, Second Department. November 18, 1910.)

GAME (§ 7*)—REGULATIONS—PENALTIES.

    Forest, Fish, and Game Law (Consol. Laws, c. 19) § 103, providing that birds and game shall not be transported without the state nor taken with intent to transport without the state, and that no person shall transport any birds for which a close season is provided in any package unless the kind and number of birds shall be plainly marked thereon, together with the initial point of billing and destination, refers only to interstate transportation. [Ed. Note.—For other cases, see Game, Dec. Dig. § 7.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, Suffolk County.

Action by the People against Charles Suydam, Jr., for a penalty. From a judgment dismissing the complaint on the merits, the People appeal. Affirmed.

Argued before WOODWARD, BURR, THOMAS, RICH, and CARR, JJ.

Robert S. Pelletreau, for the People.
John R. Vunk, for respondent.

WOODWARD, J. This action was brought to recover a penalty as provided in section 105, c. 24, Laws 1909 (Consol. Laws, c. 19), known as the "Forest, Fish, and Game Law." The complaint alleged that the defendant on or about the 7th day of January, 1910, "did knowingly, willfully, and illegally, and in violation of section 103 of chapter 24 of the Laws of 1909, transport, attempt to transport, and aid and assist in the transportation of twenty-two ducks, the same being birds for which there is a close season provided, in a package upon which the number and kind of said birds was not plainly marked as provided by the statute, and that thereby the said defendant incurred and became liable to pay," etc. The evidence, we may assume, established the fact that the defendant sent for a wagon used by the Long Island Express Company; that, when the wagon came, he placed therein a box marked to "C. C. Egbert & Son, 139 Washington Market, New York, from F. H. Gates, Islip." This box on the other end from that on which the above address was placed contained in lead pencil, "19 B. B.," "whistler," and "1 S. D.," and these are interpreted to mean 19 broad bill ducks, 1 whistler, and 1 shell drake, and it appeared upon the trial that these marks were understood by the dealers and were customary. The fact that there were 22 birds instead of 21 as would appear was explained; the testimony being that the extra bird was badly shot and practically unfit for use, and was simply thrown in without making any account of it. It thus appears that the shipment was made under an attempt, at least, to conform to the statute, and a jury would have been justified in holding that there was such a substantial compliance, with the provisions of the law as to justify a verdict in favor of the defendant. The case was not, however, submitted to the jury, and we are called upon, therefore, to determine whether there was a violation of the statute as a matter of law.

There is no suggestion that the Long Island Railroad Company transported the package. It was seized by the game protector just as it was put down upon the platform, and it must be presumed that the Long Island Railroad Company would not have violated the law by transporting the package, so that the only relation of the defendant to any alleged transportation of these ducks consisted of his placing the package in an express wagon to be taken to the station, and this was merely preliminary to the shipment to the consignee in New York, provided the Long Island Railroad Company accepted the consignment. Clearly the statute has no relation to the incidental moving of the package from the house of the defendant to the railroad station.

This is plainly evident from the provision of the act that, in addition to the kind and number of birds, the package shall give the "names of consignor and consignee, the initial point of billing and the destination." The "initial point of billing" is the point from which the transportation here under consideration is to begin, and it ends with the destination, and the evidence clearly establishes that there was no initial billing; that there was never any transportation such as the statute clearly contemplates. No one can read the provisions of this section with a view to arriving at the legislative intent without reaching the conclusion that it was drawn with special reference to railroads and steamboats, and that class of common carriers which make use of bills of lading, and that any incidental carrying to or from the "initial point of billing" was not within the contemplation of the statute. This being true, and the package never having been transported from the "initial point of billing," no offense was committed by the Long Island Railroad Company, and the defendant cannot be held liable as an accessory to a liability which was never created.

But, beyond this, the statute in question does not fairly contemplate these restrictions upon birds transported within the state. The whole section is to be read, not isolated portions of it, and, thus read, it clearly refers to transportation which is to go outside of the state. Birds consigned to points within the state from points within the state are always within the jurisdiction, and may be dealt with, but, when they are secretly shipped outside of the state, the way is open for fraud upon the game laws of this state, and it was clearly the intention of the Legislature to deal with this situation, rather than to impose conditions upon those who were already within full control of the state authorities. Section 103 of the forest, fish, and game law, which is alleged to have been violated, provides as follows:

"Birds or quadrupeds or parts thereof, game, except fish taken in this state, shall not except as herein provided and as provided in section 104, be transported without the state; nor shall the same be taken or possessed with intent to transport the same without the state. Any person doing any act with reference to such birds or game or in aid of such taking or transportation shall be deemed to have violated this section. No person shall at any time transport any birds or fish for which a close season is provided in any package unless the kind and number of such birds or fish shall be plainly marked on the outside of said package, together with the names of consignor and consignee, the initial point of billing and the destination. The reception by any person or common carrier within this state, of any such bird or birds or fish for shipment in an unmarked package shall constitute a violation of this section by such person or common carrier."

Obviously the provision that birds "shall not except as herein provided * * * be transported without the state; nor shall the same be taken or possessed with intent to transport the same without the state," refers to the provision that the same are to be shipped only in packages marked as required by the statute; that is, the manner "herein provided" for shipping birds out of the state. That this is the true construction is made clear by the further provision that any person "doing any act with reference to such birds or game or in aid of such taking or transportation shall be deemed to have violated this section," for article 7 of the forest, fish, and game law is full of provisions per-

mitting game and birds to be possessed at various times. It is only in relation to such birds as are to be transported out of the state that the limitation applies, and that limitation runs through the entire section. For instance, section 87 of the act provides that "ducks, geese, brant and swan may be taken from September sixteenth to December thirty-first, both inclusive, and possessed from September sixteenth to the last day of February, both inclusive," but the right to this possession is further limited by the provisions of section 103 that these birds shall not "except as herein provided  *  *  *  be transported without the state; nor shall the same be taken or possessed with intent to transport the same without the state." That is, it is perfectly lawful to take these wild fowl from the 16th of September to the 31st day of December, and to have them in possession for use within the state of New York up to and including the last day of February, but, if they are to be shipped outside of the state, it can only be done in the manner provided in section 103. Again, sections 89, 90, and 91 of the act provide for the open season for quail, woodcock, and grouse, and further provide that they "shall not be taken or possessed at any other time except as provided by section ninety-two of this chapter." Section 92 provides that:

"Grouse, woodcock and quail taken in this state shall not be sold or offered for sale within this state, or carried without the state, nor shall grouse, woodcock or quail taken without the state be sold or offered for sale within the state unless the person who offers for sale or sells grouse, woodcock or quail taken without the state shall have given to the commissioner a bond," etc.

Section 94 provides that "woodcock, grouse, and quail shall not be transported within this state or into the state from a point without the state less than twenty-five miles from the state line, unless accompanied by the actual owner thereof," and all through the act there is evidence that the provisions of section 103 relate, not to transportation within the state, but to transportation which is to begin within the state and terminate outside of the state, the object being to prevent fraud upon the game laws by fixing a penalty upon the interstate transportation of any of the birds which are not permitted to be taken for the purposes of commerce. Thus read and understood section 103 serves a useful purpose. It makes it obligatory upon any one selling birds outside of the state to give notice of the number and kind being shipped, and, if it develops that there are birds contained in the consignment which are not the subject of commerce, then the transportation company is held liable for the penalty. Any other reading of section 103 would bring it into conflict with other provisions of the act. For instance, the language of section 103 is broad enough to permit the shipment of grouse, woodcock, and quail within or without the state upon marking the package as provided in that section, yet section 92 provides that these birds taken in this state shall "not be sold or offered for sale within this state, or carried without the state," and section 94 provides that these same birds shall not "be transported within this state or into the state from a point without the state," etc., thus clearly indicating that the intent of section 103 of the act was to accomplish a particular purpose,

.and that the prevention of the fraudulent shipment of birds and game without the state. So long as the birds or game are within the state, they are subject to all of the laws regulating the closed season, the right to possession, sale, etc., and it is only when the hunter undertakes to ship his birds outside of the state that he is called upon to enumerate them. This is the condition on which the state permits him to mingle these birds in the commerce of the country. Thus construed, tne statute is reasonable and proper. It serves a purpose in harmony with the policy of the state, while the construction sought to be placed upon the same by the appellant would impose a needless burden upon shippers, without accomplishing any useful purpose. A shipment of ducks from Islip to New York does not in effect change the status of the birds at all. If they were lawfully possessed at Islip, and were the subject of sale, they were equally within the protection of the law in the city of New York, and the mere marking of the box with the number and kind could not change the relations of the birds to the law in any particular. If the shipper included woodcock or quail in the shipment, then the transaction was unlawful whether the same were listed on the outside or not, and, being as fully within the jurisdiction of the law in New York as in Islip, no good purpose could be served by the provisions of section 103 as to the marking.

The judgment and order appealed from should be affirmed, with costs.

BURR, J. I concur upon the last ground stated in Mr. Justice WOODWARD's opinion, namely, that the section of the forest, fish, and game law referred to does not apply to transportation within the boundaries of the state of New York. In addition to the forcible reasons stated by him, I venture to suggest that the history of the legislation confirms this view. See Laws 1900, c. 20, passed February 19, 1900, as amended by Laws 1900, c. 235, passed March 29, 1900, as amended by Laws 1904, c. 580, § 8. If section 103 of the present law (Laws 1909, c. 24) applied to the transportation of birds within this state for which a close season is provided, it seems to me clear that the defendant would be liable. The evidence is that the goods were delivered to a person in the employ of the Long Island Express Company, and were by him taken from Suydam's premises to the railroad station with the intent that they should be shipped from there to New York. The section provides that the birds shall not be "taken or possessed with intent to transport the same without the state," and that "any person doing any act with reference to such birds or game in aid of such taking or transportation shall be deemed to have violated this section." Clearly the birds were taken with intent to transport the same, and Suydam, when he delivered them to the driver of the express company, did an act in aid of such taking. Although the name of the consignor and the consignee, together with the initial point of billing (Islip) and the destination (Washington Market, New York) did appear upon the shipping address, the kind and number of the birds were not plainly marked on the outside of the package.. The first marking looks quite as much like

"1913 B" as "19 B B," and the last one quite as much like "1 S P" as "1 S D." The intermediate marking looks quite as much like "Whiskey" as anything else. But, in any event, without evidence explaining these marks, they would be unintelligible. I think that the court would have been justified in saying as matter of law that the package was not plainly marked. But, if different inferences could be drawn from the marking, then it was for the jury to say what the marking meant. It seems a contradiction in terms to say that a package is plainly marked which requires evidence to show what the marks meant. Solely upon the ground hereinbefore stated, I vote to affirm the judgment.

THOMAS, RICH, and CARR, JJ., concur.